# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Mobilitie Management, LLC,

                    Plaintiff,      Case No. 1:16-cv-04396

v.                               Michael L. Brown
                               United States District Judge

Dan Harkness,

                    Defendant.

_____/

## ORDER

This matter arises from the demise of a business relationship between Plaintiff Mobilitie Management, LLC ("Mobilitie") and its former employee Defendant Dan Harkness. Mobilitie brought this suit against Harkness, alleging misappropriation of trade secrets and other wrongdoing. (Dkt. 1-1.) Harkness filed a number of counterclaims, alleging mirrored wrongdoing. (Dkt. 11.) Both parties have moved for summary judgment. (Dkts. 83; 127.)

## I.   Factual Background

Plaintiff Mobilitie, a nationwide provider of distributed antenna system wireless solutions ("DAS systems"), hired Defendant Harkness as

its Director of Wireless Solutions, eventually promoting him to Vice President. (Dkts. 117 ¶ 2; 127-2 ¶ 1.) As part of his employment, Harkness signed an Employee Confidentiality Agreement. (Dkts. 127-2 ¶ 28; 144 ¶ 28.) The Confidentiality Agreement described Mobilitie's proprietary information and prohibited Harkness from misappropriating any proprietary or confidential Mobilitie information. (Dkts. 127-2 ¶ 31; 144 ¶ 31.) The Confidentiality Agreement also prohibited Harkness from making any disparaging comments about Mobilitie. (Dkts. 127-2 ¶ 30; 144 ¶ 30.)

Mobilitie's main source of business is the design, construction, and operation of networks and infrastructure to deliver optimal wireless coverage in highly populated or otherwise challenging wireless network environments. (Dkts. 127-2 ¶ 2; 144 ¶ 2.) This includes arenas, malls, hospitals, and universities. (Id.) While employed with Mobilitie, Harkness was part of the team that worked on the Seattle Sound Transit ("SST") Project, which provided wireless service to the Seattle mass transit provider. (Dkts. 83-2 ¶ 4; 117 ¶ 4.) It was the first ever underground tunnel system in which Mobilitie developed and deployed a DAS wireless system. (Dkts. 127-2 ¶ 3; 144 ¶ 3.) Because it had never

developed such a system, Mobilitie created confidential and trade secret information in order to respond to SST's request for information and successfully bid on the project. (Dkts. 127-2 ¶¶ 4–5; 144 ¶¶ 4–5.) Specifically, Mobilitie contracted with multiple third-party consultants to conduct research about network design and the unique features of working in subway/tunnel environments. (Dkt. 127-2 ¶¶ 6–8.) Mobilitie paid these consultants a lot of money for their work. (*Id.* ¶¶ 8, 10.)

Harkness claims detailed information on the SST project is available online and through public records requests. (Dkts. 83-2 ¶¶ 5, 6; 117 ¶ 6.) He also claims SST issued a press release when it approved the contract with Mobilitie. (*Id.*) But Mobilitie counters that only *some* information about its government agency projects are available online. (Dkt. 117 ¶ 5.) Parts of the projects — including design, financial terms, and deployment costs — are confidential. (*Id.* ¶ 6.) While it was public information that SST had used Mobilitie, the specifics and detailed information about the project was not. (*Id.* ¶ 5.) The engineering and design of the SST network and how the system was installed in the tunnels is confidential to the extent it is not basic knowledge readily known in the marketplace. (Dkt. 127-2 ¶ 11.)

Mobilitie testified that it "derives value from keeping information contained in its Proof of Concept Agreement and Scope of Work [for the SST Project] confidential because the design plans are unique to the tunnel environment, were created at significant cost to Mobilitie, and if used by a competitor would give the competitor a significant head start in pursuing similar projects for mass transit providers without having to make the initial investment in research design like Mobilitie did." (*Id.* ¶ 14.) Mobilitie also considers the business terms of the SST Project a trade secret and provided evidence that it takes reasonable steps to protect it as such. (*Id.* ¶ 16.) Harkness disputes this, claiming Mobilitie has introduced no evidence showing it had protectable confidential or trade secret information, that it took reasonable steps to protect the information, or that the information was useful or of value to others. (Dkt. 144 ¶ 14.) But by virtue of his employment with Mobilitie, Harkness had access to all of the preliminary research Mobilitie and third-party consultants performed, as well as detailed information regarding the complete "trial and error" process for the SST Project network design. (Dkt. 127-2 ¶ 15.) He also had access to internal financial and business models related to the SST Project, including

4

information about margins, subcontractor prices, the value of license agreements with carriers, specific key contacts with carriers, and how to market such a project to carriers. (*Id.* ¶ 26.)

In April 2016, Mobilitie terminated Harkness after eliminating his position. (Dkts. 83-2 ¶ 7; 117 ¶ 7; 127-2 ¶ 32.) The day before his termination, Harkness copied his entire Mobilitie laptop onto a personal USB device. (Dkt. 127-2 ¶ 33.) Mobilitie claims Harkness did this because he knew he was going to be fired and wanted to keep company information. (*Id.*) Harkness admits that he copied the files but claims he was unaware Mobilitie was about to fire him. (Dkt. 144 ¶ 33.) He denies doing this to steal Mobilitie's information. (*Id.*)

Harkness did not return Mobilitie's laptop when terminated.[1] (Dkt. 127-2 ¶ 34.) So, Mobilitie sent a security guard to his home to retrieve it. (*Id.* ¶ 35.) Harkness, however, did not turn over the personal USB device. (*Id.* ¶ 36.) Harkness admits that he still had Mobilitie data on the USB

---

[1] Harkness objects to many of the facts in Mobilitie's statement of facts as "irrelevant." But they are not. The series of events is material to Mobilitie's claims. Moreover, a blanket assertion of "irrelevancy" or "disputed," without further factual support from the record, is insufficient under the Local Rules to put a fact in dispute. *See* LR 56.1(B)(2)(a)(2), NDGa.

device and that he used it to upload Mobilitie data onto his personal laptop computer.  (*Id.* ¶¶ 37–38; Dkt. 144 ¶¶ 37–38.)

Mobilitie contends that "among other confidential and trade secret information, the designs and plans for the SST Project were on the USB drive that Harkness copied to his personal laptop."  (Dkt. 127-2 ¶ 39.) Harkness did not tell Mobilitie that he had copied his entire work laptop onto his personal laptop until after Mobilitie examined the returned laptop, discovered that Harkness had erased it, found evidence that a USB drive had been attached to it, and became suspicious.  (Dkts. 117 ¶ 10; 127-2 ¶ 40.)  Harkness claims that he "volunteered" to Mobilitie that he had their information and that, although he deleted information off of the computer, he did not mean to wipe it.  (Dkt. 144 ¶ 40.)  Mobilitie disputes whether he "volunteered" this information, instead testifying that Harkness did not reveal that he had copied the information until after he was confronted with forensic evidence of the transfer.  (Dkt. 117 ¶¶ 10–11.)

Harkness then refused to turn over the confidential information he had copied onto his external USB drive and his personal laptop, demanding a severance payment from Mobilitie.  (Dkt. 127-2 ¶ 40.)

6

Mobilitie agreed to his demand.  (*Id.*)  Over the next several weeks, Harkness and Mobilitie negotiated the Separation Agreement.  (Dkt. 117 ¶ 9.)   It prohibited Harkness from disclosing any of Mobilitie's confidential or proprietary information or trade secrets to any other employee or individual.  (Dkt. 127-2 ¶ 42.)  It also prohibited Harkness from making any disparaging statements about Mobilitie.  (*Id.* ¶ 43.)  In exchange, Mobilitie agreed to pay Mr. Harkness three payments of $31,000.  (Dkt. 83-1 at 23.)  The Separation Agreement incorporated the previously signed Confidentiality Agreement, which had similar provisions.

Mobilitie's obligation to pay severance was conditioned on Harkness returning all company property and a successful examination by an independent forensic examiner to confirm he had not deleted, copied, or recreated any company information.  (Dkt. 117 ¶ 12.)  After signing the Separation Agreement, Harkness delivered his personal laptop and USB drive to Mobilitie's lawyers.[2]  (*Id.* ¶ 15.)  The forensic

---

[2] Harkness takes issue with how long the examination took and where the laptop was sent, claiming that Mobilitie promised it would be examined in Atlanta and take only a few days.  (Dkt. 83-2 ¶¶ 13–14.) Whatever Mobilitie may have promised outside of the Separation Agreement is irrelevant, however.  Harkness signed the Agreement that

expert examined the devices and deleted all files Mobilitie believed contained its information.  (Dkts. 83-2 ¶ 28; 117 ¶ 28.)  The examiner testified that he had to remove approximately sixty gigabytes of Mobilitie information from the laptop, including over 350,000 items in folders marked "Mobilitie."  (Dkt. 117 ¶ 19.)

Harkness repeatedly claims the examiner confirmed that all Mobilitie-related data was deleted from his personal devices.  (Dkts. 83-2 ¶¶ 25–28; 117 ¶ 25–28.)  But whether the information was deleted is relatively immaterial as Harkness could have transferred data to some other device.  The examiner found that Harkness had deleted more than sixty files from his laptop before handing it over to Mobilitie's lawyers.  (Dkt. 117 ¶ 20.)  Mobilitie contends that it asked the forensic investigator to recover the deleted files so that it could "determine whether Defendant had attempted to cover his tracks by deleting any information that could be used to connect his new business [Quantum] to Mobilitie's proprietary

---

specifically disclaimed that he was not "relying on any promises or representations not stated in the agreement." (Dkt. 117 ¶¶ 14, 16.) The length and location of the forensic examination, therefore, does not affect the enforceability of the Agreement or otherwise excuse Harkness's performance of his contractual obligations.

and confidential information."[3]  (*Id.*)  The forensic examiner was unable to exclude the possibility that Harkness had already uploaded Mobilitie's information to another computer or storage platform.  (*Id.* ¶ 83.)  After the forensic examiner confirmed that all of its files had been deleted from Harkness's personal laptop and the USB device, Mobilitie made its first severance payment to Harkness under the terms of the Separation Agreement.  (*Id.* ¶ 29.)

In June 2016, the Maryland Transit Authority ("MTA") contacted SST to ask for feedback about Mobilitie's work on the SST Project.  (Dkt. 127-2 ¶ 44.)  There was no public bidding process for the MTA wireless project, and it was not public knowledge that MTA was looking to put a wireless system in its subway.  (Dkts. 117 ¶¶ 34–35; 127-2 ¶ 45.)  In mid-June 2016, two months after Mobilitie terminated Harkness's employment, MTA contacted Mobilitie and said it wanted to move forward with the project of having Mobilitie provide a wireless service solution.  (Dkt. 127-2 ¶ 46.)  Mobilitie conducted a site walk with MTA

---

[3] Harkness also presents facts about Mobilitie's forensic examination of his computer and how it accessed his password-protected files, some of which related to his new business Quantum Wireless, LLC.  (Dkt. 83-2 ¶¶ 19–23.)  These facts are immaterial to the Court's analysis on summary judgment based on the parties' claims at issue.

and shortly thereafter exchanged a draft lease agreement and revisions. (*Id.* ¶ 47–51.)  The parties expected to close the deal with Mobilitie quickly.  (*Id.* ¶ 49.)

Harkness learned about the MTA project in late July 2016 during lunch with a former coworker.  (Dkt. 117 ¶ 36.)  On August 4, 2016, he emailed personnel at MTA to introduce his company, Quantum, and discuss commercial wireless solutions for MTA.  (Dkts. 117 ¶ 39; 127-2 ¶ 53; 144 ¶ 52.)  The email stated that he had "won the bid" for the SST Project and had led all of Mobilitie's efforts on the project.  (Dkt. 127-2 ¶ 54.)  MTA's representative with whom Mobilitie had been working forwarded Harkness's email to Mobilitie.  (*Id.* ¶ 55.)  Mobilitie interpreted the email as a misrepresentation of both Harkness's role in the SST Project and his qualifications to compete for the MTA project. (*Id.* ¶ 56.)

Contrary to Harkness's assertions, the SST project was a team-based project, and winning the bid for the project was a team effort.  (*Id.* ¶ 57.)  A team of at least six Mobilitie Vice Presidents worked on the project, along with multiple third-party companies to perform the design and construction.  (*Id.* ¶¶ 58–60.)  Further, much of the early-phase

research for the project took place before Harkness even joined the Mobilitie. (*Id.*) Mobilitie contends, therefore, that Harkness's characterization that he "won" and completed the project on his own was a misrepresentation.

Harkness admits he did not do the SST Project by himself. (Dkts. 127-2 ¶ 61; 144 ¶ 61.) Nevertheless, he repeatedly disputes Mobilitie's facts by citing his own deposition testimony and asserting that "Mr. Harkness and his experience were the primary factor in Mobilitie getting the SST project." (Dkt. 144 ¶¶ 58–63.) Mobilitie contends that that this communication to MTA demonstrated that "Harkness planned to use confidential Mobilitie information associated with the SST build and the tunnel system, including what he learned [from Mobilitie's data] to try and win the MTA project." (Dkt. 127-2 ¶ 65.) Harkness disputes this but cites no evidence to the contrary.

After receiving the forwarded email chain, Mobilitie contacted MTA to say it believed Harkness was in breach of his contractual obligations to Mobilitie. Harkness contends Mobilitie told MTA that he was subject to a non-compete, which all parties agree he is not. (Dkts. 83-2 ¶¶ 40, 62; 117 ¶¶ 40, 62.) No record evidence suggests Mobilitie made that

statement.  (Dkts. 83-2 ¶ 40; 117 ¶ 40.)  Instead, Mobilitie presented the

letter it sent MTA, stating that Harkness's communications to MTA "are

a breach of [his] legal and contractual obligations to Mobilitie."  (Dkt.

127-2 ¶ 73.)  The letter, in part, stated:

> Mr. Harkness continues to be subject to an Employee
> Confidentiality Agreement (the "Confidentiality Agreement")
> with Mobilitie. Pursuant to this agreement, as well as state
> trade secrets laws, Mr. Harkness may not disclose any trade
> secret or confidential information of Mobilitie to MTA or use
> any trade secret or confidential information of Mobilitie in his
> efforts to secure work from MTA. This restriction includes,
> without limitation, any knowledge and know how associated
> with the confidential projects that Mr. Harkness worked on
> while employed with Mobilitie, such as the Sound Transit
> project that Mr. Harkness referenced in his prior
> communications to MTA. Any disclosure of such confidential
> information or trade secrets by Mr. Harkness would be a
> violation of legal obligations.

(*Id.* ¶ 74.)  Harkness bases his defamation claim solely[4] on the August 9,

2016, letter from Mobilitie to MTA, claiming it was disparaging.  (*Id.*

¶ 76.)  But he also admits that the letter accurately recites his ongoing

confidentiality obligations under the Confidentiality Agreement and that

---

[4] Harkness disputes this fact, claiming that Mobilitie also informed MTA that Harkness was in violation of a non-compete clause but providing no other basis for his defamation claim.  (Dkt. 144 ¶ 76.)  As the Court has already discussed, the record contains no evidence of this assertion.

"[t]he letter speaks for itself" in that it does not mention any sort of non-compete restriction.  (*Id.* ¶¶ 77–79; Dkt. 144 ¶ 79.)

After receiving the letter, an MTA employee emailed Harkness and told him that it had "been notified by Mobilitie that you are in breach of contractual obligations. I suggest discussing this with them prior to sending MTA any further proposals or correspondence." (Dkt. 117 ¶ 41.) Rather than doing so, Harkness sent MTA another email a few days later, this time referencing Mobilitie's financial status and casting Mobilitie's business methods in a negative light.  (Dkt. 127-2 ¶ 66.)  Harkness disputes this, contending that the email contained "nothing disparaging or confidential." (Dkt. 144 ¶ 66.)  His email, however, admittedly told the MTA employee that "Mobilitie will throw money at the project like crazy without understanding the requirements and that she would have trouble garnering carrier interest and buy-in." (Dkt. 117 ¶ 56.)

Harkness continued to communicate with MTA, hoping to get sufficient information to prepare a bid of his own on behalf of Quantum. (Dkt. 127-2 ¶ 67.)  He never received enough information.  (*Id.* ¶ 68.)

Neither party got the project with MTA.  They dispute the reason. Harkness says his communication with MTA had no effect on Mobilitie's

dealings with MTA or MTA's decision not to go forward with the project. (Dkts. 83-2 ¶ 49; 117 ¶ 55; 144 ¶ 80.)  He claims MTA and Mobilitie continued to negotiate long after his contact with MTA, but MTA changed its administrator and put the project on indefinite hold.  (Dkt. 83-2 ¶ 51; 144 ¶ 80.)  Mobilitie claims MTA stopped the process of approving the agreement with Mobilitie after Harkness contacted MTA  (Dkt. 127-2 ¶ 80.)  It also points to testimony that Harkness's action "significantly slowed the process" and that the project was on hold because of a subpoena Harkness issued to the MTA.  (Dkt. 117 ¶ 55.)  Whether Harkness caused Mobilitie to lose the project is a key factual dispute. Mobilitie contends that had it been awarded the MTA contract, it could have earned a substantial profit.  (Dkt. 127-2 ¶ 82.)

Mobilitie paid Harkness one payment of $31,000 under the Separation Agreement before concluding Harkness had violated the agreement and withholding further payments.  (*Id.* ¶ 81.) Mobilitie sued Harkness asserting claims for breach of the Confidentiality Agreement (Count One), breach of the Separation Agreement (Count Two), misappropriation of trade secrets (Count Three), intentional interference

with prospective economic relations (Count Four), and injunctive relief (Count One). (Dkt. 1-1 ¶¶ 15–46.)

Defendant Harkness counterclaimed, alleging claims for breach of the Separation Agreement (Count One) and the implied covenant of good faith and fair dealing (Count Two), libel, slander, and defamation (Count Three), libel and slander per se (Count Four), tortious interference with prospective contractual relation (Count Five), and punitive damages and expenses of litigation (Count Six).

The parties' claims share substantial overlap. Both parties claim the other breached their contractual obligations. Harkness and Mobilitie each accuse the other of disparaging and slandering their name and reputation. And both argue that the other intentionally interfered with potential business opportunities. Both have now moved for summary judgment as to most of the existing claims and counterclaims in this matter. (Dkts. 83; 127.)

## II.   Legal Standard

### A.   Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party

opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

### B.   Motions to Seal

Federal Rule of Civil Procedure 26(c) provides that a court, for good cause, may issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including requiring that a trade secret or other confidential research, development,

or commercial information not be revealed or be revealed only in a specified way. FED. R. CIV. P. 26(c)(1)(H). Courts determine whether there is good cause to seal by balancing the public's "interest in obtaining access" against the "party's interest in keeping the information confidential." *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001). Further, "discovery material filed in connection with pretrial motions that require judicial resolution of the merits" is subject to the common-law right of access to judicial proceedings, which includes the right to inspect and copy public records and documents. *Id.* at 1311–12. The common-law right of access "requires the court to balance the respective interests of the parties." *Id.* at 1313.

## III.  Analysis & Discussion

### A.  Motions for Summary Judgment as to Plaintiff Mobilitie's Claims

Harkness moves for summary judgment as to each of Plaintiff Mobilitie's claims against him. (Dkt. 83-1 at 24.) Mobilitie opposes Harkness's motion and filed a cross-motion arguing it is entitled to summary judgment on its claims that Harkness breached the

Confidentiality and Separation Agreements.  (Dkt. 127-1 at 4.)  The Court discusses each of Mobilitie's claims in turn.

### 1. Mobilitie's Claim for Breach of Contract of the Confidentiality Agreement (Count One)

Harkness seeks summary judgment as to Mobilitie's claim for breach of the Confidentiality Agreement.  (Dkt. 83-1 at 20.)  Mobilitie not only opposes Harkness's motion but instead seeks summary judgment itself.  (Dkt. 127-1 at 22.)

Harkness's main argument is that the two agreements — the Separation Agreement and the Confidentiality Agreement — are unenforceable because they are not limited in time or scope.  According to Harkness, both agreements "purport to apply indefinitely.  This alone makes them unenforceable."  (Dkt. 83-1 at 21.)  Harkness is incorrect. "[A] contractual duty to maintain a trade secret or limit use of a trade secret shall not be deemed void or unenforceable solely for lack of a durational or geographical limitation on the duty."  GA. CODE ANN. § 10-1-767.  Harkness has failed to meet his burden for summary judgment.

Under Georgia law, Mobilitie must establish four elements to prove breach of contract: (1) the existence of a valid contract; (2) that Defendant breached the contract; (3) that Mobilitie performed under the contract or

otherwise has a right to complain about the contract being broken; and (4) resulting damage. *Benjamin v. Am. Airlines, Inc.*, 32 F. Supp. 3d 1309, 1318 & n.7 (S.D. Ga. 2014). Mobilitie bases its claim on what it considers to be Harkness's disparagement of it in his interactions with MTA and his reliance on and use of information about Mobilitie's confidential and trade secret business information. (Dkt. 127-1 at 24.) Harkness contends that he did no such thing and that Mobilitie's characterization of his remarks as disparaging is incorrect. Because a genuine dispute of material facts exists regarding whether Harkness in fact disparaged Mobilitie or used its confidential and trade secreted information, the Court declines to grant summary judgment to Mobilitie on this count of its complaint. There is also a genuine issue of material fact as to whether Mobilitie suffered damages — specifically the loss of the MTA contract — as a result of Harkness's alleged breach of the Confidentiality Agreement. The Court denies Mobilitie's motion for summary judgment on this claim.

### 2. Mobilitie's Claim for Breach of Contract of the Separation Agreement (Count Two)

For the reason the Court denies Harkness's motion for summary judgment on Mobilitie's claim that he breached the Confidentiality

Agreement, the Court also denies his motion for summary judgment on Mobilitie's claim that he breached the Separation Agreement.  The Court also denies Mobilitie's motion for summary judgment on this claim for the same reasons it denies its motion for summary judgment on the breach of the Confidentiality Agreement claim.  A genuine dispute of material fact exists regarding whether Harkness used confidential, proprietary, and trade secreted information, whether his comments about Mobilitie in fact breached his contractual anti-disparagement obligations, and whether it suffered any damages as a result of any alleged breach.

### 3. Mobilitie's Claim for Misappropriation of Trade Secrets (Count Three)[5]

Harkness argues Mobilitie's trade secret misappropriation claim must fail because Mobilitie "has no trade secrets, Mr. Harkness did not misappropriate anything, and Mobilitie has no damages."  (Dkt. 138 at 7.)  He claims he "has not retained, used, or disclosed any of Mobilitie's confidential information."   (Dkt. 83-2 ¶ 61.)   He also makes various claims, that "[t]here is no secret to what Mobilitie does," that "[n]either

---

[5] Mobilitie did not move for summary judgment on this claim.

Mobilitie's services nor its business model are proprietary," and that "Mobilitie's prospective customers are easily determined by anyone with an understanding of the industry." (*Id.* ¶¶ 58–60.) Harkness combines these facts to argue Mobilitie has no trade secrets or confidential information that he could have misappropriated. But Mobilitie vigorously disputes Harkness's characterizations of its business model. It points to evidence that it uses trade secrets and confidential information to provide cutting-edge wireless solutions to various highly populated or otherwise challenging wireless network environments. (Dkt. 127-2 ¶¶ 1–2.)

The parties also dispute Harkness's motivations for copying the data from his Mobilitie laptop onto the USB drive and his personal computer the day before he was fired. Harkness testified that he did not make a backup of his Mobilitie work laptop to steal Mobilitie's information. But Mobilitie provides evidence of his nefarious intentions, Harkness's reluctance to return its information, and the forensic expert's inability to exclude the possibility Harkness made additional copies of the information. This is precisely the credibility determination a jury, not a court at summary judgment, must make. *See Skop v. City of*

*Atlanta*, 485 F.3d 1130, 1141 (11th Cir. 2007); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.").

Circumstantial evidence exposes inconsistencies in Harkness's testimony. Where such circumstantial evidence exists, it is sufficient to create a jury question as to whether misappropriation occurred. *DS Waters of Am., Inc. v. Fontis Water, Inc.*, No. 1:10-cv-0335-SCJ, 2012 WL 12873620, at *2–3 (N.D. Ga. Dec. 4, 2012) (finding that where circumstantial evidence contradicted direct evidence, evidence of the nonmovant was to be believed and all reasonable inferences drawn in his favor such that the jury would be entitled to make credibility determination at trial). The dispute between the parties regarding whether (or to what extent) Harkness misappropriated trade secrets and confidential information is genuine, material, and hotly contested. The Court denies Harkness's motion for summary judgment as to Mobilitie's claim for trade secret misappropriation.

### 4. Mobilitie's Claim for Intentional Interference with Prospective Economic Relations (Count Four)[6]

Under California law, a claim for the tort of intentional interference with prospective economic advantage requires a plaintiff to establish:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (internal citations omitted).[7]  As to each of these factors, Mobilitie has pointed to evidence in the record that at least establish a genuine dispute of material fact whether Harkness intentionally interfered with

---

[6] Mobilitie did not move for summary judgment on this claim either.

[7] Under Georgia's choice of law rules, the substantive law of the state where the tort was committed governs tort cases.  *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1555, 1586 (M.D. Ga. 1989). Generally (outside of the specific trade secret context previously discussed), this is the place where the injury is sustained.  *See Mgmt. Sci. Am., Inc. v. NCR Corp.*, 765 F. Supp. 738, 739 (N.D. Ga. 1991).  An injury is sustained by a corporation where it is headquartered.  *nVision Glob. Tech. Sols., Inc. v. Cardinal Health 5, LLC*, 887 F. Supp. 2d 1240, 1271 (N.D. Ga. 2012).  Because Mobilitie is headquartered in California, California law applies to its tort claims.

Mobilitie's potential economic relationship with MTA.  And Harkness has failed to meet his burden of showing an absence of genuine dispute of material fact.

He emphasizes that he cannot be liable for interference with Mobilitie's prospective economic relations because he has no mass-transit customers.  But that is not for a lack of trying.  (*See* Dkt. 138 at 14.)  And the parties dispute why the deal between Mobilitie and MTA fell through. Harkness contends that it was not because of anything he said to MTA but rather because MTA's administrator changed.  (Dkts. 83-2 ¶ 49; 117 ¶ 55; 144 ¶ 80.)  Alternatively, Mobilitie shows that Harkness's contact with MTA had an effect on the negotiations.  (Dkt. 117 ¶ 55.)  Because a genuine dispute of material fact exists on this claim, the Court denies Harkness's motion for summary judgment.

### 5. Mobilitie's Claim for Injunctive Relief (Count Five)

Harkness's argument for summary judgment on this count appears to be strictly that, because all of Mobilitie's other claims fail, so too must this claim fail.  (Dkt. 83-1 at 23 ("Mobilitie's [sic] is not entitled to injunctive relief because all of its claims fail.").)  Such an argument fails to meet Harkness's burden as movant on summary judgment,

particularly because the Court already ruled that Mobilitie's tort claim in Count Four may proceed. The Court denies Harkness's motion as to this count.

All of Mobilitie's claims may proceed to trial.

## B.  Motions for Summary Judgment on Defendant Harkness's Counterclaims

Mobilitie seeks summary judgment as to each of Defendant's counterclaims. (Dkt. 127-1 at 4.) Harkness alternatively seeks summary judgment as to his counterclaim for breach of contract (Count One), and for judgment as to liability for his claims for libel, slander, and defamation (Count Three), and libel and slander per se (Count Four). (Dkt. 83-1 at 24.) He does not seek summary judgment on his remaining claims. The Court addresses each of Harkness's counterclaims in turn.

### 1.  Harkness's Claim for Breach of Contract of the Separation Agreement (Count One)

Mobilitie argues that it is entitled to summary judgment as to Harkness's claim for breach of the Separation Agreement. Harkness opposes the motion and simultaneously seeks summary judgment for himself on this claim.

Harkness's argument that he did not breach the agreement but that Mobilitie did is logically flawed. Essentially, Harkness argues that he was not required to comply with the agreement until he received each installment of his severance pay. This interpretation makes little sense and is unsupported by the record evidence. It strains credulity to argue that Mobilitie would agree to make severance payments over a period of six months while permitting Harkness, during that interim period, to make use of its confidential information and disparage Mobilitie throughout the industry until the final payment was made. The Court denies Harkness's motion for summary judgment on this count of his counterclaims.

Mobilitie seeks summary judgment on this count as well. (Dkt. 127-1 at 5.) The Court denies Mobilitie's motion, however. Mobilitie argues that it is entitled to summary judgment because Harkness's breach of the Separation Agreement discharged its obligation to remit any further severance payment to him under the Agreements. (*Id.*) But as discussed above, a genuine dispute of fact exists regarding whether Harkness breached his contractual obligations under either the Confidentiality or Separation Agreements. Mobilitie's argument therefore must fail here.

## 2. Harkness's Claim for a Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Two)

Mobilitie seeks summary judgment as to Harkness's claim for breach of the implied covenant of good faith and fair dealing. (Dkt. 127-1 at 8.)  Harkness opposes the motion but does not seek summary judgment himself on the claim. (Dkt. 143 at 11.)

Harkness alleges his breach of the duty of good faith and fair dealing claim on: (1) Mobilitie's failure to pay Harkness sums allegedly owed to him; (2) Mobilitie's alleged defamation of Harkness to the MTA and other third parties; (3) Mobilitie's allegedly frivolous cease and desist letter; and (4) Mobilitie's alleged interference with Harkness's right to compete in the marketplace. (Dkt. 11 at 13.)  Only Harkness's claim about the failure to pay sums owed under the Separation Agreement has any bearing or connection to the parties' contractual agreement, as required to maintain a claim of the breach of good faith and fair dealing.[8] The other allegations attempt to impose "substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of

---

[8] Per its terms, California law governs the Separation Agreement and thus governs any claims for an implied duty of good faith and fair dealing as it relates to that agreement. (Dkt. 116 at 14 n.4.)

the agreement" and thus cannot form the basis for a claim of breach of the implied duty of good faith. *See Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1128, 1144–45 (E.D. Cal. 2012); *see also Plastino v. Wells Fargo Bank*, 873 F. Supp. 2d 1179, 1191 (N.D. Cal. 2012) ("Importantly, to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify the specific contractual provision that was frustrated.").

And the record contains no evidence to suggest that Mobilitie's refusal to make the remaining payments under the Separation Agreement was done in bad faith, as required to assert a claim for the breach of the implied duty of good faith and fair dealing. *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 397–98 (1990). Instead, the record shows that Mobilitie withheld the last two payment because it believed Harkness breached the Separation Agreement. Whether that is in fact true is currently in dispute based on the record.

Further, Harkness does not cite a bit of evidence to support his position that there is a question of fact as to his claim. Because of the lack of such evidence, no reasonable juror could determine that Mobilitie's refusal to make the final two payments under the Separation

29

Agreement rose to the requisite level of "bad faith" to support a claim for breach of the implied duty of good faith and fair dealing. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (holding that there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party). The Court thus finds Mobilitie entitled to judgment as a matter of law on Harkness's claim for breach of the duty of good faith and fair dealing.

### 3. Harkness's Claim for Libel, Slander, and Defamation (Count Three)

A cause of action for defamation consists of four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm."[9] *Infinite Energy, Inc. v. Pardue*, 713 S.E.2d 456, 460–61 (Ga. Ct. App. 2011).

---

[9] To determine the law applicable to tort claims, Georgia focuses on where the injury occurred. *See Mgmt. Sci. Am., Inc. v. NCR Corp.*, 765 F. Supp. 738, 739 (N.D. Ga. 1991). Where the injury occurred is "the place where . . . there takes place the last event necessary to make an actor liable for an alleged tort." *Id.* The law of Georgia thus applies as Harkness's alleged damages were sustained in Georgia.

Mobilitie is entitled to summary judgment on Harkness's claim of defamation because the allegedly defamatory statements were entirely truthful.  Truth is a complete defense to defamation claims.  *McCall v. Couture*, 666 S.E.2d 637, 639–40 (Ga. Ct. App. 2008).  Though normally a question for a jury, if a statement is "not ambiguous and reasonably can have only one interpretation, the question of defamation is one of law for the court." *Id.* (internal quotation marks omitted).  "A plaintiff cannot recover for alleged defamation where he admits the truth of the communications attributed to the defendant." *Id.*

Here, the allegedly defamatory communications included Mobilitie's explanation that it believed Harkness's actions were in breach of his contractual obligations under his agreements with his former employer and an explanation of those contractual obligations.  Harkness admits that Mobilitie's statements within the August 9 letter were accurate.  At his deposition, Harkness admitted that the letter accurately recited his confidentiality obligations to Mobilitie; that Mobilitie's statement to MTA that the SST project was a team effort was true; that the letter did not reference a non-compete agreement; and that the letter only referred to Mobilitie's belief that Harkness violated his legal and

contractual obligations.  Because Harkness admits that the statements in the August 9 letter are true, his claim fails as a matter of law.  Even if the statements were to be considered defamatory, the Court would still nevertheless hold them privileged as made with "a good faith intent on the part of the speaker to protect [its] interest in a matter in which [it] is concerned."  *Smith v. DiFrancesco*, 802 S.E.2d 69, 73 (Ga. Ct. App. 2017).

Harkness raises additional claims of defamation in his response to Mobilitie's motion for summary judgment.  But these claims are based on what he considers to be defamation of his new company Quantum Wireless, LLC.  Harkness's claims for defamation on behalf of his company must fail as a matter of law.  *Compare, e.g.*, *Southland Pub. Co. v. Sewell*, 143 S.E.2d 428, 432–33 (Ga. Ct. App. 1965) (explaining that, under Georgia law, an individual only has standing to sue for defamation on behalf of his business where his name is a component part of the business name); *see also Kimball v. Better Bus. Bureau of W. Fla.*, 613 F. App'x 821, 824 (11th Cir. 2015) (holding plaintiff had standing to sue on behalf of business entity only because "company name was comprised of his initials").

Mobilitie is entitled to summary judgment on this count.

32

### 4. Harkness's Claim for Libel and Slander Per Se (Count Four)

Harkness claims that Mobilitie per se defamed him because it told MTA that he had a non-compete clause when he did not and that he was in violation of a contractual provision. First, the record contains no evidence that Mobilitie ever said he was in breach of a non-compete agreement. The portions of the record Harkness cites simply reference contractual obligations.

Second, Mobilitie's statements about other alleged breaches were entirely truthful. No one disputes that Harkness had contractual obligations under both the Confidentiality and Separation Agreements or that Mobilitie believed that he violated those obligations. Strangely, Harkness continues to reference a non-existent non-compete agreement, which the record simply does not support: "And Mobilitie lied to the MTA by claiming that Mr. Harkness breached a non-existent non-compete agreement!" (Dkt. 143 at 12 n.34.) But this exclaimed assertion contains *no* reference to the record or any evidence that might create a genuine dispute of material fact. There is no basis in the record for Harkness's claim. The Court grants summary judgment to Mobilitie on this claim.

### 5. Harkness's Claim for Tortious Interference with Prospective Contractual Relation (Count Five)

Harkness alleges a counterclaim for tortious interference with a prospective contractual relation based on Harkness's allegation that Mobilitie wrongfully interfered with his potential business opportunity with MTA. (Dkt. 11 ¶¶ 44–47.)

"To establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury."[10] *Green v. Johnston Realty, Inc.*, 442 S.E.2d 843, 846 (Ga. Ct. App. 1994) (citations omitted). A court may grant summary judgment "if the defendant pierces the pleadings with respect to any single element of the cause of action." *Green v. Johnston Realty, Inc.*, 442 S.E.2d at 846.

---

[10] Georgia law governs this claim because Harkness is based in Georgia where he alleges the injury occurred. *See Mgmt. Sci. Am., Inc.*, 765 F. Supp. at 739.

34

"[T]o establish a cause of action for interference with prospective business relations, plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact." *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 444 S.E.2d 333, 334–35 (Ga. Ct. App.1994) (citing *Perry & Co. v. New S. Ins. Brokers,* 354 S.E.2d 852 (Ga. Ct. App. 1987)).  Here, Harkness has not put forth any evidence that his relationship with MTA was reasonably likely to develop in fact.  To the contrary, the only employee of MTA to testify stated that, when Harkness contacted her, she had no knowledge of him, his company, or his experience, that MTA was not soliciting bids on the project, and that she was unaware if Quantum Wireless could even provide the services MTA was seeking.  (Dkt. 127-2 ¶¶ 45, 69–71.)  Further, Harkness admits that he could not even write a proposal because he did not have sufficient information to do so.  (*Id.* ¶ 68.)

Harkness argues that "the facts show that he had a strong likelihood of landing the MTA deal, but for Mobilitie's interference" and that "his experience and expertise made him the superior choice for the project." (Dkt. 143 at 17–18.)  But Harkness points to no facts to support this claim, only his own speculation.  He repeatedly lobs accusations at

Mobilitie, calling Mobilitie a liar and arguing that it filed this frivolous and strategic lawsuit to wreck Harkness's livelihood. (*Id.* at 1, 19.) He claims that Mobilitie "fabricated" its claims to prevent him from competing, referring to Mobilitie's actions as an "orchestrated campaign to harm him in the industry" and accusing Mobilitie of "concocting a knowingly baseless" reason to not pay him. (*Id.* at 11, 19, 21.) But Harkness's accusations are not facts. *See Sparks v. Parks*, 324 S.E.2d 784, 787–88 (Ga. Ct. App. 1984) (explaining that "conclusory allegations by the plaintiff of conspiracy, malice, and defamation, are insufficient in the absence of substantiating fact or circumstances, to raise a material issue for trial" and granting summary judgment where "[t]he evidence mustered by the plaintiff to oppose defendant's summary judgment motion contains mere conclusions and suppositions" and "does not set forth specific facts demonstrating express malice").

In his response in opposition to Mobilitie's motion for summary judgment, Harkness also raises new claims that Mobilitie is responsible for interference with his relationship with various other venues. This argument fails because these alleged contractual business relationships existed between Quantum — a separate legal entity — and the venues,

not between *Harkness* and the venues.  Harkness cannot bring these claims for tortious breach of Quantum's economic or contractual relationships.  *Compare, e.g., KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1324 (11th Cir. 2004); *Becker Designs, Inc. v. Biker Design, Inc.*, No. 6:06-cv-56-Orl-22DAB, 2006 WL 2444075, at *4 (M.D. Fla. Aug. 22, 2006).  And importantly, a plaintiff may not surreptitiously amend his claims through argument in a brief opposing summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Harkness has failed to show a triable issue of fact suggesting Mobilitie intentionally interfered with his prospective business relations. Mobilitie is thus entitled to summary judgment.

## 6. Harkness's Claim for Punitive Damages and Expenses of Litigation (Count Six)

Because the Court has already ruled that Mobilitie is entitled to summary judgment as to each of Harkness's tort claims, the Court holds that Harkness's claim for punitive damages likewise cannot stand.  *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1304–05 (11th Cir. 2009) ("[W]here a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."); *see also Ahmed v. Air France-KLM*, 165 F. Supp. 3d 1302, 1316 (N.D. Ga.

2016) ("It is axiomatic that punitive damages are not recoverable for breach of contract, even if the breaching party acted in bad faith.").  All that remains of Harkness's substantive claims is his claim for breach of the Separation Agreement, which cannot give rise to exemplary damages. The Court thus grants summary judgment to Mobilitie and dismisses Harkness's claim for punitive damages.

The Court also grants summary judgment to Mobilitie on Harkness's claim for attorneys' fees and litigation expenses.  Because he brings only compulsory counterclaims, Harkness cannot pursue a claim for litigation expenses under Georgia law.  "[T]he award of expenses of litigation under O.C.G.A. § 13-6-11 can only be recovered by the plaintiff in an action under the language of the statute; therefore, the defendant and plaintiff-in-counterclaim cannot recover such damages where there is a compulsory counterclaim." *Graybill v. Attaway Constr. & Assocs.*, 802 S.E.2d 91, 96 (Ga. Ct. App. 2017) (citations omitted); *see also Tri-State Consumer Ins. Co. v. LexisNexis Risk Sols., Inc.*, 858 F. Supp. 2d 1359, 1375 (N.D. Ga. 2012) ("[A] plaintiff-in-counterclaim cannot recover attorney's fees under O.C.G.A. § 13-6-11 unless he asserts a counterclaim

which is an independent claim that arose separately from or after the plaintiff's claim."); *see also* GA. CODE ANN. § 9-11-13(a).

All of Harkness's counterclaims arise out of the same agreement and series of events following his termination and involving the MTA dealings, which are also the source of the claims in Mobilitie's original complaint. *See Graybill*, 802 S.E.2d at 96 ("[A] a pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."). Harkness's counterclaims thus do not entail "independent claim[s] that arose separately from or after the plaintiff's claim." *Byers v. McGuire Props., Inc.*, 679 S.E.2d 1, 9 (Ga. 2009).  As noted above, Harkness attempts to raise new arguments and claims in his response to Mobilitie's motion for summary judgment.  But the Court has found those claims without merit and they thus do not give rise to new or independent claims entitling Harkness to attorneys' fees.  Mobilitie is entitled to judgment as a matter of law on Harkness's counterclaim for litigations expenses under Georgia law.  *See* GA. CODE ANN. § 13-6-11.

**C.     Motions to Seal (Dkts. 122; 134; 139; 145; 154)**

The parties have filed various motions to seal documents in this case in connection with their motions for summary judgment and their statements of material facts.

**1.     Plaintiff Mobilitie's Motions to Seal (Dkts. 122; 134; 154)**

Mobilitie's motions and briefs argue that the Court should retain under seal unredacted copies of various documents because they have been designated as "CONFIDENTIAL" OR "CONFIDENTIAL— ATTORNEYS' EYES ONLY."   Mobilitie argues that the materials contain sensitive, trade secret information (and testimony about the same) that Mobilitie treats in a confidential manner.  Mobilitie argues that public disclosure of these trade secret materials would make them available to Mobilitie's competitors and harm their business interests. The Court agrees with Mobilitie that the disclosure of these documents would defeat their commercially sensitive and confidential nature of these trade secrets and confidential business information.  The Court also notes that Mobilitie has been selective in which documents it has requested to be sealed and has not broadly tried to seal the entirety of its filings.  It has also filed redacted versions of the documents that will

40

remain on the public docket.   The Court holds that Mobilitie has demonstrated good cause to retain these documents under seal and grants Mobilities' motions to seal.  (Dkt. 122; 134; 154.)

### 2. Defendant Harkness's Motions to Seal (Dkts. 139; 145)

Harkness has also filed motions for leave to file matters under seal. He, however, has declined to show good cause why the Court should permit him to retain these documents under seal.  Instead, he asserts only that the documents contain sensitive information designated as "CONFIDENTIAL" and "ATTORNEYS' EYES ONLY."   Harkness provides the Court with no basis for why these particular documents should remain sealed.  "[C]alling a document confidential does not make it so in the eyes of the court." *See In re Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 184 F. Supp. 2d 1353, 1362 (N.D. Ga. 2002); *see also Chi. Tribune*, 263 F.3d at 1313 (holding that a party seeking protection of discovery materials filed under seal in connection with a motion for summary judgment must show "good cause"); *Fed. Nat'l Mortg. Ass'n v. Prowant*, 269 F. Supp. 3d 1290, 1292 (N.D. Ga. 2015) ("Party agreement alone does not supply an interest in confidentiality sufficient to outweigh the public's right to access to the material upon which a public decision

on the merits is founded."). Harkness's requests to seal are also broader than Mobilitie's requests. As just one example, Harkness provides no argument why emails regarding an annual golf tournament should remain sealed from public view.

While the parties' information enjoys greater protection during discovery, once the document is "filed in connection with any substantive pretrial motion, unrelated to discovery, [it] is subject to the common law right of access." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007). This is because "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern," and [t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Id.* This right thus cannot be overcome without a showing of good cause. And the Court finds that Defendant Harkness has failed to demonstrate good cause why these particular documents should remain under seal. The Court denies Defendant Harkness's motions to seal. (Dkts. 139; 145.)

## IV.  Conclusion

The Court **DENIES** Defendant Harkness's Motion for Partial Summary Judgment (Dkt. 83).

The Court **GRANTS in part** and **DENIES in part** Plaintiff Mobilitie's Motion for Summary Judgment (Dkt. 127).   The Court **GRANTS** the motion as to all but Count One of Defendant Harkness's counterclaims and **DISMISSES** each of those counterclaims.  Harkness's claim for breach of the Separation Agreement (Count One) shall be allowed to proceed.  The Court **DENIES** the motion as to Plaintiff Mobilitie's claims for breach of contract of the Confidentiality Agreement (Count One) and breach of contract of the Separation Agreement (Count Two).

In this matter, the following claims shall be allowed to proceed:

- Each of Plaintiff Mobilitie's claims (Counts One through Five)
- Defendant Harkness's counterclaim for breach of the Separation Agreement (Count One)

The Court **GRANTS** Plaintiff Mobilitie's motions to file under seal (Dkt. 122; 134; 154) and **DIRECTS** the Clerk to **SEAL** Plaintiff

Mobilitie's filings at Docket numbers 119, 120, 121, 132, 133, 152, and 153.

The Court **DENIES** Defendant Harkness's motions to file under seal (Dkts. 139; 145) and **DIRECTS** the Clerk to **LIFT** the seal on Defendant Harkness's filings at Docket numbers 137, 138, and 144.

**SO ORDERED** this 26th day of November, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE